[Cite as *State v. Ross*, 2018-Ohio-452.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | CASE NO. 2016-P-0060 |
| STEPHEN ROSS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Portage County Court of Common Pleas, Case No. 2015 CR 00837.

Judgment: Affirmed.

*Victor V. Vigluicci*, Portage County Prosecutor, and *Pamela J. Holder*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*William A. Vasiliou, II*, The Gothic Building, 54 East Mill Street, Akron, OH 44308-1736 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Stephen Ross, appeals his conviction in the Portage County Court of Common Pleas, following a jury trial, of rape and gross sexual imposition of his daughter, H.R., who, at the time, was less than ten years old. The principal issues are whether appellant's conviction was supported by sufficient evidence and whether his conviction was against the manifest weight of the evidence. For the reasons that follow, we affirm.

{¶2} As pertinent to this appeal, appellant was indicted for three counts of rape of a female under ten years old, felonies of the first degree, and three counts of gross sexual imposition of a female under 13 years old, felonies of the third degree. Appellant pled not guilty and the case proceeded to jury trial.

{¶3} H.R.'s mother, Amy Bianco ("Mother"), testified that she and appellant were married in 2004. They lived in a home in Streetsboro and had two children, H.R., who was born in 2005, and another daughter, who was born in 2007.

{¶4} H.R., who at the time of trial was 11 years old, testified that her first memory of being sexually abused by appellant was when she was three years old. She said that at that time her family was on vacation and staying in a hotel. When she was alone with appellant in the hotel room, he pulled down her underwear and touched her private parts. She described her private parts as the areas that are covered by a bathing suit, including the butt, vagina, and breasts.

{¶5} H.R. testified that between the time she was three and ten, appellant repeatedly engaged in this type of behavior. She said this would take place when the two of them were alone in a room, sometimes during the day and sometimes at night.

{¶6} H.R. said that appellant would kiss her and put his tongue in her mouth. He would pull her underwear down and touch her vagina with his fingers and mouth and would sometimes lick it. She said he would suck her breasts and rub his penis against her vagina. She said sometimes "white slippery stuff" came out of it that would go on her parents' bed or around her leg area.

2

**{¶7}** H.R. said that one time appellant made her lick his penis. She said he put his penis inside her mouth and when he tried to shove it in further, she made it end by turning her head away.

**{¶8}** H.R. said her father did these things to her five to ten times or more in their home. H.R. said her father would say this was their "little secret." She said it made her feel important because appellant gave her more attention and she felt he "treasured" her more than her sister.

**{¶9}** H.R. said she realized this was not appropriate behavior between a father and daughter when she was about six years old, but, she said, she did not tell anyone at that time because she did not want her father to stop loving her. When asked why she did not tell her doctors, she said, "I thought that it wasn't that bad. * * * I could always make an excuse up in my head about not doing it."

**{¶10}** H.R. said this conduct continued after her parents separated and her father moved into an apartment in 2013 (when she was eight years old) until she was ten years old at which time she finally told her mother.

**{¶11}** Mother testified that when H.R. was three, she started experiencing anxieties that were serious enough that they affected her sleep. At that time, she also started having temper tantrums, acting out aggressively toward her sister, and experiencing "meltdowns" for no apparent reason that caused her to scream, yell, and cry. When H.R. was four, she was urinating on towels and blankets and then hiding them. Mother reported this to H.R.'s therapist. H.R.'s pediatrician referred Mother to a child psychiatrist. H.R. was diagnosed with generalized anxiety disorder and she was

prescribed medication. However, H.R.'s sleep problems, urinating issues, anxieties, and meltdowns continued.

{¶12} When H.R. was seven years old and in second grade, H.R.'s school reported to Mother that there was an allegation that H.R. had been "caressing" some of the other students' "butts" in a sexual way.

{¶13} Then, when H.R. was eight, a neighbor caught H.R. and his daughter dancing in their garage and H.R. had her underwear pulled down.

{¶14} Mother said that, beginning when H.R. was three, she and her husband took H.R. to see a series of therapists, psychologists, and psychiatrists, but her anxieties and behavioral issues only became worse.

{¶15} Appellant testified that in 2012, he began an affair with a woman from work, which he kept secret from his co-workers and Mother until she discovered it in 2013. In October of that year, appellant moved out of the marital residence to an apartment in Streetsboro. At that time Mother and appellant told H.R. and her younger sister that appellant would no longer be living with them. They told the girls that they would continue living in their home with Mother and that they would regularly visit with appellant. Mother said that H.R.'s sister cried hysterically, but H.R. showed no emotion.

{¶16} Appellant had weekly visitation with the girls in his apartment. At that time H.R. was eight and nine years old. She said that during these visits, her father engaged in the same kinds of sexual acts with her about five more times. She said, "[h]e rubbed his penis against my vagina. I remember him putting his penis in my mouth. I remember him sucking my breasts and I remember him kissing me all over."

4

{¶17} Mother testified that late one evening in June 2015, H.R. came to her bedroom crying, sweating, and with her face red, saying she needed to talk to her. After Mother was able to calm H.R. down, she said her father had been touching her on her private parts since she was three years old. H.R. said, "Please don't tell him. I don't want him to know I told you. Just make it stop." The next morning, Mother called H.R.'s counselor, Ms. Wiggins. She told Mother to bring H.R. in to see her and to report the abuse to the County Hotline, which she did. On June 18, 2015, Mother reported the abuse to the Streetsboro Police Department. On June 25, 2015, she took H.R. to the Children's Advocacy Center at Robinson Memorial Hospital to be interviewed. Streetsboro Police Detective Brian Shaffer met Mother at the Advocacy Center and observed H.R. being interviewed.

{¶18} Mother obtained a protective order from the domestic relations court on June 19, 2015. Appellant had supervised visitation with the children from that time until December 2015, when the court terminated visitation pending the criminal action.

{¶19} Mother said that since December 2015, H.R.'s behavior has significantly improved. Mother said H.R. has been "amazing." She plays, laughs, has friends, and is "a different kid." Mother said that, in the past, any random thing would cause H.R. to have a meltdown. Now, the only things that upset H.R. are things that would upset any normal 11-year old and the frequency of such events has greatly declined.

{¶20} When Mother was asked if, in hindsight, she ever thought something wrong was occurring, she said that one night she fell asleep on the couch downstairs. She woke up at about 6:00 a.m. and went upstairs to get in bed. At the time, appellant and H.R. were in her and appellant's bed. She said H.R. was awake, but was

5

uncharacteristically silent. Mother said, "[h]er eyes were big" and she looked "scared." Mother said that, "looking back on it now, it doesn't feel right." However, she said, "at the time it just struck me as odd."

{¶21} Nurse Carlyn Johnson, a Forensic Interviewer and a Pediatric Sexual Assault Nurse Examiner (PSANE) at the Children's Advocacy Center at Robinson Memorial Hospital, testified that on June 25, 2015, she conducted a PSANE interview of H.R. and performed a medical examination of the child. She said the result of the exam was normal, meaning there were no tears to her genitalia. However, she said that if a child was penetrated recently (within a few days), they may see physical findings. But, she said, the tissues of a girl's private area are like the inside of a mouth, i.e., they are easily torn, but they heal quickly and really well. She said that if such conduct occurred more than one week earlier, she would not expect to see physical findings. Such would be the case here for two reasons: appellant had not subjected H.R. to any sexual conduct within the last six months and he never penetrated her vagina with his penis.

{¶22} Nicole Bartlett, a certified trauma counselor at Children's Advantage, a family mental health facility, testified she started working with Mother and H.R. in August 2015 and has been treating H.R. since she reported the abuse.

{¶23} Ms. Bartlett said that by the time the case was referred to her, J.F.S. had a "substantiated allegation" and had made a finding and the Children's Advocacy Center had completed a PSANE interview and a physical exam of H.R.

{¶24} Ms. Bartlett said that H.R. was still suffering from many anxiety-related symptoms when she began working with her. Her team created a treatment plan for H.R. to decrease her symptoms and help her life improve. Ms. Bartlett said that H.R's

6

anxiety continued while she was seeing her father in supervised visitation, but that shortly after visitation stopped in December 2015, H.R.'s anxiety symptoms subsided to the point where they were able to see progress. She said, "as we progressed through therapy, her symptoms have decreased significantly and she's been able to be in school without intrusive images and concentration issues." Ms. Bartlett said that, while preparing for trial, H.R.'s trauma symptoms temporarily increased, but she said this is normal because a child re-experiences the trauma when required to remember the abuse. Ms. Bartlett testified that H.R.'s symptoms were consistent with a child that experienced sexual abuse.

{¶25} After the state rested its case, appellant testified on his own behalf, denying he ever abused H.R. He testified there were no hard feelings between him and Mother. He said that in general visitation was handled really well and they had a "great" working relationship co-parenting the children. Thus, he did not suggest that Mother had anything to do with H.R.'s allegations.

{¶26} Similarly, appellant said that after the separation and divorce, he still had a "great" relationship with H.R. and her behavior never changed toward him. He said that H.R. never got angry or resentful with him, and H.R. never gave him any reason to think she made up her allegations to harm him. When asked by his attorney on direct why H.R. would make up these allegations, he said he did not know, but he speculated it might have had something to do with a report in the local news around that time that the principal of H.R.'s school had been caught soliciting sex from a 13-year old. However, this had nothing to do with H.R. or appellant.

7

{¶27} Significantly, appellant said he did not know how H.R., a ten-year old girl, would know how to make these allegations unless she actually experienced the abuse.

{¶28} Further, appellant's two defense experts unwittingly provided testimony that supported the state's case. Laurence Rosenberg, M.D., a pediatrician, testified on cross-examination that regressive behaviors, like urinating problems or acting out by touching children in ways the child abuse victim was touched, such as H.R. experienced, are consistent with child sexual abuse.

{¶29} Likewise, appellant's second expert, psychologist, Jolie Brams, Ph.D., testified on cross that a child's (such as H.R.'s) urination problems; emotional control issues; acting out the abusive behaviors they experienced at the hands of an abuser with other children; acting out against a sibling; delay in reporting the abuse for an extended period of time, even years; and reporting the abuse to a trusted parent, rather than a doctor or therapist, are all consistent with child sexual abuse.

{¶30} Following the presentation of the evidence, the jury returned a verdict finding appellant guilty of one count of rape and three counts of gross sexual imposition as charged in the indictment. The jury found appellant not guilty of the two remaining counts of rape. At sentencing, the trial court addressed appellant and aptly stated, "every time [H.R.] had a meltdown, every time she was obstinate, every time she threw tantrums, she was trying to tell everybody what was happening to her. She just couldn't formulate the words to do it because you were still right there. And she loved you, and she probably still does, because you're her dad."

8

{¶31} The court sentenced appellant to 15 years to life in prison on the rape count and five years for each count of gross sexual imposition, all terms to be served consecutively to the other, for a total of 30 years to life.

{¶32} Appellant appeals his conviction, asserting four assignments of error. For clarity of analysis, they are taken out of order. For appellant's fourth assignment of error, he alleges:

{¶33} "The appellant's convictions were against the sufficienicy [sic] and the manfiest [sic] weight of the evidence."

{¶34} An appellate court reviewing the sufficiency of the evidence examines the evidence admitted at trial and determines whether, after viewing the evidence in a light most favorable to the state, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). "On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring). Whether the evidence is legally sufficient to sustain a verdict is a question of law, which we review de novo. *Id.* at 386.

{¶35} In contrast, a court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of the witnesses. *Thompkins, supra*, at 387. The court determines whether, in resolving conflicts in the evidence and deciding witness credibility, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* The discretionary power to grant a new trial should

9

only be exercised in the exceptional case in which the evidence weighs heavily against the conviction. *Id.* Witness credibility rests solely with the finder of fact, and an appellate court is not permitted to substitute its judgment for that of the jury. *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). The role of the reviewing court is to engage in a limited weighing of the evidence in determining whether the state properly carried its burden of persuasion. *Thompkins, supra*, at 390. If the evidence is susceptible to more than one interpretation, an appellate court must interpret it in a manner consistent with the verdict. *State v. Banks*, 11th Dist. Ashtabula No.2003-A-0118, 2005-Ohio-5286, ¶33.

{¶36} Appellant was convicted of rape, in violation of R.C. 2907.02(A)(1)(b), which provides: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * *, when [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." "Sexual conduct" is defined at R.C. 2907.01(A) as

{¶37} vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶38} Appellant was also convicted of three counts of gross sexual imposition, in violation of R.C. 2907.05(A)(4), which provides: "No person shall have sexual contact with another, not the spouse of the offender; [or] cause another, not the spouse of the offender, to have sexual contact with the offender * * * when [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." "Sexual contact" is defined at R.C. 2907.01(B) as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic

10

region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

**{¶39}** With respect to appellant's rape conviction, the state presented evidence that appellant had H.R. perform fellatio on him at the family home and in appellant's apartment and that he performed cunnilingus on her in the family home. In *State v. Falkenstein*, 8th Dist. Cuyahoga No. 83316, 2004-Ohio-2561, appeal denied by the Ohio Supreme Court at 107 Ohio St.3d 1405, 2005-Ohio-5859, the Eighth District held that "'the law requires no further activity to constitute cunnilingus [under R.C. 2907.01(A)] beyond the placing of one's mouth on the female's vagina.'" *Id*. at ¶15, quoting *State v. Bailey*, 78 Ohio App.3d 394, 395 (1st Dist.1992). With respect to appellant's convictions for gross sexual imposition, H.R. testified that appellant sucked her breasts, touched her vagina with his fingers, and rubbed his penis against her vagina.

**{¶40}** In support of his sufficiency argument, appellant argues that, other than H.R., the state did not present any physical evidence of abuse. Appellant fails, however, to cite any case law holding that such evidence was necessary to support his convictions. This court, in *State v. Henderson*, 11th Dist. Trumbull No. 2001-T-0047, 2002-Ohio-6715, stated: "When prosecuting an offender for rape, the state is not required to provide physical evidence of penetration. Rather, all the state must do is establish, beyond a reasonable doubt, that sexual conduct occurred. This may be accomplished through either physical evidence and/or witness testimony." *Id*. at ¶36. Further, this court held, "[t]he victim's testimony, if believed, [is] sufficient to convict appellant of the charged crime." *Id*. In any event, as Nurse Johnson testified, physical

11

evidence would not have been expected here because H.R. did not report appellant penetrated her vagina with his penis and his sexual abuse stopped about six months before H.R. reported the abuse to Mother.

{¶41} With respect to appellant's manifest-weight argument, he fails to reference any inconsistencies in H.R.'s testimony or between her testimony and that of the other witnesses, which is the usual basis of a manifest-weight challenge. Instead, he argues that the jury should have disregarded the state's evidence in favor of his testimony, his character witnesses, and his two hired experts. He argues that because H.R.'s doctors and therapists testified that H.R. did not report the abuse to them while they were treating her, this casts doubt on her credibility. However, appellant's own expert, Jolie Brams, psychologist, testified it is not unusual for a child sex abuse victim to delay reporting the abuse for years and it is also not unusual for the child to first disclose abuse to a trusted adult, such as Mother, rather than to a medical provider.

{¶42} Further, the fact that appellant was able to hire two defense experts to challenge H.R.'s credibility does not mean the jury was required to accept their testimony. The jury was entitled to consider the fact that neither witness ever interviewed, examined, evaluated, or even met H.R., while the state's experts interviewed, evaluated, and/or treated her over an extended period of time. Moreover, the state demonstrated on cross-examination serious weaknesses in the testimony of both defense experts. For example, Dr. Rosenberg said he is a pediatrician, not a child psychologist, and does not treat children psychologically for sexual abuse. And, Dr. Brams said she testifies primarily for the defense. Moreover, both witnesses said the primary reason they doubted abuse occurred here was because none of the doctors

12

H.R. had seen in the past made any reports of abuse. However, this is not surprising since H.R. did not disclose the abuse to them. Moreover, as noted, Dr. Brams testified that a child sex abuse victim's delay in disclosing the abuse, even for years, is consistent with child sexual abuse.

{¶43} In finding appellant guilty, the jury obviously found H.R., Mother, and the medical professionals presented by the state to be more credible than appellant and his witnesses. As the finder of fact, this was the jury's province and we cannot say this is the exceptional case in which the jury clearly lost its way and created such a manifest miscarriage of justice that appellant is entitled to a new trial.

{¶44} We therefore hold appellant's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶45} Appellant's first and second assignments of error are related and thus considered together. They allege:

{¶46} "[1.] The trial court abused its discretion by violating the appellant's right to a fair trial under the Fifth and Fourteeth [sic] Amendment [sic] to the United States Constitution and Section 16, Article I of the Ohio Constitution when it excluded part of the expert opinion of Dr. Brams.

{¶47} "[2.] The trial court committed plain error by violating the appellant's right to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution when it gave a curative instruction that caused the jury to believe that they must disregard all of Dr. Bram's [sic] expert opinion."

**{¶48}** We review the trial court's ruling excluding evidence for an abuse of discretion. *State v. Dyer*, 11th Dist. Lake No. 2015-L-121, 2017-Ohio-426, ¶40. This court has stated: "'a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Id.*, quoting *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991).

**{¶49}** In *State v. Boston*, 46 Ohio St.3d 108, 128 (1989), the Ohio Supreme Court held that "an expert's opinion testimony on *whether there was sexual abuse* would aid the jurors in making their decision and is, therefore, admissible pursuant to Evid.R. 702 and 704." (Emphasis added.) However, "[a]n expert may *not* testify as to the expert's opinion of the *veracity of the statements of a child* declarant" who claims she has been raped. (Emphasis added.) *Id.* at syllabus. In *State v. Stowers*, 81 Ohio St.3d 260, 261 (1998), the Supreme Court clarified its syllabus in *Boston,* and held "[a]n expert witness's testimony that the behavior of an alleged child victim of sexual abuse is consistent with the behavior observed in sexually abused children is admissible under the Ohio Rules of Evidence." *Stowers* at 261. "'Most jurors would not be aware, in their everyday experiences, of how sexually abused children might respond to abuse.'" *Id.* at 262, quoting *Boston* at 128. Such expert testimony is permitted "to counterbalance the trier of fact's natural tendency to assess * * * delayed disclosure as weighing against the believability and truthfulness of the witness." *Stowers* at 263.

**{¶50}** Dr. Brams testified that, while she had never met or interviewed H.R., she reviewed certain records regarding H.R. selected by defense counsel. As a result, she testified about five findings she made, which she felt indicated H.R. was not credible.

14

She found that: (1) H.R. had been treated by many providers over the years and they did not report sexual abuse; (2) the providers diagnosed H.R. with mental health problems, not sexual abuse; (3) H.R.'s young age when the abuse allegedly began raised concerns about the accuracy of her memory; (4) H.R.'s disclosure of sexual abuse lacked emotion; and (5) H.R. had external influences, including the need for attention. Dr. Brams also testified, H.R. "has significant difficulties with reality testing and truth telling * * *." While this testimony came dangerously close to violating *Boston* and *Stowers,* defense counsel was apparently not satisfied with it and actually asked his witness to give an opinion about the credibility of H.R.'s allegations. In response, Dr. Brams answered: "My opinion is that * * * this child's statements regarding her father's * * * sexually abusing her are a result of her mental health concerns and developmental experiences, rather than actual acts perpetrated by her father."

{¶51} Upon giving this final opinion, the trial court called counsel to the bench and advised that Dr. Brams had improperly given an opinion about H.R.'s veracity. The trial court called a recess, after which the court instructed the jury:

> {¶52} Ladies and Gentlemen, before we begin with the cross-examination of this witness by [the state's counsel] I am going to give you an additional instruction in that the opinion rendered just before we took the break by Dr. Brams, I am striking her answer. You are to totally disregard it as if it were never said. * * * The ultimate decision of credibility of witnesses lies with you, the jury, not with the witness who testifies.

{¶53} Contrary to appellant's argument, the court struck Dr. Brams' entire answer, not just part of it. In arguing on appeal that Dr. Brams' opinion was permissible, appellant is asking this court to extend or ignore the rule in *Boston* and *Stowers.* He argues defense counsel should have been allowed to call a hired expert to challenge

15

the veracity of a victim in a child rape case, as opposed to the state calling an expert to dispel a misconception that might weigh against the child-victim's credibility, which is the point of *Stowers*. *Id.* at 262-263. While some Districts have held that any error resulting from a *state expert's* suggestion that a child victim was credible was harmless as long as the victim testified and was subject to cross, none of the cases cited by appellant held that *Boston* and *Stowers* apply to a *defense expert* hired to challenge the credibility of the child, especially where the expert never even met the child.

**{¶54}** In any event, even if the court erred in striking Dr. Brams' opinion, the error would have been harmless in light of the trial court's admission of Dr. Brams' other testimony, as outlined above, in which she indicated H.R. was not credible. Any such error would also be harmless because, as appellant concedes, his other hired expert, Dr. Rosenberg, testified H.R.'s allegations were not truthful.

**{¶55}** We therefore hold the trial court did not abuse its discretion in striking the opinion of Dr. Brams regarding H.R.'s credibility.

**{¶56}** Next, appellant argues that the trial court's instruction that the jury disregard Dr. Brams' opinion regarding H.R.'s veracity was vague because the court did not sufficiently explain what opinion it was striking. As a result, appellant argues that since Dr. Brams' entire testimony was opinion, the jury may have concluded the court was striking her entire testimony. However, as appellant concedes, trial counsel did not object to this instruction and, thus, our review of this issue is for plain error only. In any event, since the judge stated she was referring to the opinion provided by Dr. Brams just before the break, we do not see how the jury could have reasonably understood that the court was referring to anything other than the witness' final opinion that H.R.

16

was not credible.  Further, defense counsel put the unstricken testimony of Dr. Brams before the jury in closing argument.

**{¶57}** We thus hold the court did not commit plain error in instructing the jury to disregard Dr. Brams' opinion on this issue.

**{¶58}** For appellant's third and final assigned error, he alleges:

**{¶59}** "The appellant's right to effective trial counsel under Sixth [sic] Amendment to the United States Constitution was violated by trial counsel's lack of knowledge of recent case law pertaining to the admissibility of Dr. Bram's [sic] expert testimony, failing to object to the vagueness of the curative jury instruction pertaining to Dr. Bram's [sic] testimony & [sic] failing to confront the alleged victim with prior statement recorded and referenced in motion for new trial."

**{¶60}** The standard of review for ineffective assistance of counsel was stated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and has been repeatedly followed by this court. *State v. McKinney*, 11th Dist. Trumbull No. 2007-T-0004, 2008-Ohio-3256, ¶187.

**{¶61}** In order to support a claim of ineffective assistance of counsel, the defendant must satisfy a two-prong test.  First, he must show that counsel's performance was deficient. *Strickland, supra*. This requires a showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. *Id.*  Second, the defendant must show the deficient performance prejudiced the defense. In order to satisfy this prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's * * * errors, the result

17

of the [trial] would have been different." *Id.* at 694; *accord State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus.

{¶62} Appellant argues his trial counsel was ineffective for three reasons. First, he argues his counsel was unaware of case law regarding the admissibility of Dr. Brams' expert testimony. However, because defense counsel argued this testimony was admissible and also because we hold the opinion at issue was properly stricken by the court, counsel's performance was not deficient.

{¶63} Next, appellant argues counsel was deficient in not objecting to the vague nature of the court's jury instruction about Dr. Brams' opinion testimony. However, because we hold the trial court's instruction was not vague, again, counsel was not deficient.

{¶64} Finally, appellant argues his trial counsel was ineffective in not cross-examining H.R. regarding a recording she made for appellant telling him she loved him. However, "[t]he scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶101.

{¶65} We therefore hold that appellant failed to show his trial counsel was ineffective.

{¶66} For the reasons stated in this opinion, the assignments of error lack merit and are overruled. It is the order and judgment of this court that the judgment of the Portage County Court of Common Pleas is affirmed.

DIANE V. GRENDELL, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

_____

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

{¶67} I agree with appellant that his convictions are based on insufficient evidence, and are against the manifest weight of the evidence. I would reverse and remand.

{¶68} The only evidence against appellant is the testimony of H.R. herself, and evidence that H.R.'s myriad behavior problems might be consistent with sex abuse. Against this is appellant's own testimony, and the testimony of his experts. I respectfully submit that Dr. Brams' testimony is critical. The majority states, correctly, that the balance of her work is done on behalf of defendants in cases involving alleged sex abuse. The majority fails to acknowledge that some 30% of her work is done on behalf of the courts directly. She is a nationally recognized expert in child sex abuse.

{¶69} As the majority acknowledges, Dr. Brams identified several areas of concern regarding H.R. The majority further acknowledges that the first was the fact that no mental health professional treating H.R. had ever considered whether sex abuse might be the cause of her behavior problems. But the majority fails to consider the breadth of the treatment she has received. H.R. has been in counseling and treatment constantly since she was three years old. She has worked with psychiatrists, psychologists, and social workers. All were mandated reporters of suspected sex abuse. Nevertheless, during the seven years from the time she began treatment, until

19

she disclosed her allegations to her mother, not *one* of these specialists even *considered* exploring the issue of sex abuse. Dr. Brams testified this is extraordinary.

{¶70} Having reviewed H.R.'s lengthy medical records, Dr. Brams noted that H.R. has consistently expressed hatred toward her little sister, resulting in verbal and extreme aggression, including kicking her sister in the head. H.R. has eating disorders. She has no control of her emotions. She is unable to perceive social situations. Dr. Brams testified H.R. appears to have cognitive discontrol, with mental instability underlying all her actions.

{¶71} The majority states that Dr. Brams testified that "H.R.'s young age when the abuse allegedly began raised concerns about the accuracy of her memory." I respectfully disagree with the majority's characterization of Dr. Brams' testimony on this point. H.R. alleged the abuse began when she was three, or three and one half. Dr. Brams testified that a three and one-half year old child likely would have *no* memory of the type of abuse alleged. Believing this to be the most important part of Dr. Brams' testimony, I quote it at length.

{¶72} Defense Counsel: "When would a child start to have memory?"

{¶73} Dr. Brams: "Well, this is a topic, the topic of children's memory has been of concern to social scientists for about the past thirty-five, forty years. And there as a voluminous amount of research on children's memory which would take days testify about. But in general, what the research shows is that *prior to age about fifty-four to fifty-eight months*, that's general, so you're looking at about three and a half years old, children really are unable to store meaningful memories over the course of time than any verbal or story telling narrative to them. They may be able to store flashes of

20

memory but they have to be memories that have significance. There has to be a central significance, something that's painful, something that's frightening, something that is very central, difference to their life, such as a car accident.

{¶74} "You know Hayley was involved in a car accident and it would not be surprising to me if she had some painful, frightening memories of that event, especially because that was something that her mother and family it meant something to them and they talked about that. That was a family event.

{¶75} "* * *

{¶76} Defense Counsel: "Doctor, at that age, and I don't mean to be getting so graphic here, but would the act of cunnilingus be a memory that a child would have?

{¶77} Dr. Brams: "This is what I'm getting into. So when we talk about cunnilingus at age three and a half years old, it is not painful, it is nothing a child would think would be sexual or criminal or anything because children at that age have been diapered for years. They've had baby powder or Desitin or KY put onto their vulva. Anyone's who had children, we diaper them, they get diaper rash. I will be graphic here, everybody who's diapered a female child, has touched their vulva. It's just part of parenting and part of taking care of a child. So she's had her vulva touched. If it is cunnilingus, it's not painful, there's no reports that if this happened he scared her or anything like that. The report is that he did cunnilingus supposedly when mom was giving another child a bath or something in a hotel room or whatever.

{¶78} "There is nothing in the literature that would substantiate the child would remember this type of event at that young age. Because the research is abundantly

clear that children of this age do not store memories unless they are central that they're frightening or something that's repeated like a trip to Disney World.

{¶79} "I mean, one of the things – all my friends take their grandchildren to Disney World and they spend thousands and thousands of dollars. My advice is don't do that unless you're doing that for yourself because the kids don't remember. Because they're too young to remember that unless you repeat that over and over again.

{¶80} "So the cunnilingus, the research would suggest that that is not a valid memory.

{¶81} Defense Counsel: "And, Doctor, if it was a very traumatic thing like forceful -- "

{¶82} Dr. Brams: "Intercourse?"

{¶83} Defense Counsel: "Intercourse."

{¶84} Dr. Brams: "Slapping someone around, hurting somebody, it's possible she would have a flashable memory of that. If something was inserted into her, she was frightened, if she was cut, if she was put into a closet, if she was scared, if something terrible happened to her, there is a possibility at that age, and again we're getting into that fifty-four, fifty-eight months, that she may have a memory of that.

{¶85} "But cunnilingus in that situation, based scientifically with a reasonable psychological possibility, anything is possible, but when you're looking a psychological scientific probability, it is not probable that she would have remembered that." (Emphasis added)

{¶86} I further quote from near the end of Dr. Brams' testimony, when she made her last finding regarding H.R. The majority characterizes this as a finding that "H.R. had external influences." I think the testimony goes much further.

{¶87} Defense Counsel: "Doctor, what is your next finding?"

{¶88} Dr. Brams: "Well, my next finding is just again about her perceptions. I don't want to call [H.R.] a liar, that's not my testimony today. My testimony is not that this child lies, that's inappropriate to say. And it's inappropriate to say that she's a bad child or that she's a deviant child, that is not my testimony. *But this child's mental health, the structure of her mental health is that she has a difficult time perceiving truth from lies, facts from fiction*. And my concern is that her tendency to say what she wants, that a boy kissed her on the thigh and he didn't, she kissed a boy on the lips and she didn't, she cut herself because of Demi Lovato and she didn't. She told one therapist that she never tells the truth.

{¶89} "This is a continuing personality pattern with her. She's too young to say her personality's formulated and you hope it'll change. But there's some underlying issues with her about telling the truth. And it's not that she is a purposeful terrible little girl. It's a very sad situation. But in terms of forensic court related issue, I have to go on empathy for [H.R.] and look at the facts of the matter. And the facts of the matter are, does she have the mental structure, the personality structure to be able to be truthful and to understand the significance of what she's saying. And my concern is if you look at her from three years old to the point in time that I stopped looking at the records, my professional conclusion is that she has significant difficulties with reality

23

testing and truth telling that would raise significant red flags about her statements." (Emphasis added.)

**{¶90}** In sum, Dr. Brams found that H.R. was never even considered a potential victim by any of the many mental health professionals who treated her throughout the years. Dr. Brams found she had memories from a lengthy period of her short life that she was unlikely to have. Dr. Brams found her mental structure to be such as to make it difficult for her to distinguish fantasy or wish from fact.

**{¶91}** "A challenge to the sufficiency of the evidence tests whether the state has properly discharged its burden to produce *competent*, probative, evidence on each element of the offense charged." (Emphasis added.) *State v. Petefish*, 7th Dist. Mahoning No. 10 MA 78, 2011-Ohio-6367, ¶16. H.R.'s testimony is the sum and substance of the state's case. Therefore, the question presented in this case is not H.R.'s veracity: it is whether she was competent to testify. Based on Dr. Brams' testimony, she was not. Thus, I would find the state presented insufficient evidence to support appellant's convictions. For the same reasons, I would find the convictions against the manifest weight of the evidence.

**{¶92}** I respectfully dissent.