[Cite as *State v. Dubois*, 2024-Ohio-6115.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

           Plaintiff-Appellee,

- vs -

DAVID DUBOIS,

           Defendant-Appellant.

CASE NO. 2023-A-0073

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2022 CR 00306

## O P I N I O N

Decided: December 31, 2024
Judgment: Affirmed

*Coleen M. O'Toole*, Ashtabula County Prosecutor, and *Christopher R. Fortunato*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*William P. Bobulsky,* William P. Bobulsky Co., LPA, 1612 East Prospect Road, Ashtabula, OH 44004 (For Defendant-Appellant).

ROBERT J. PATTON, J.

{¶1} Defendant-appellant, David Dubois ("appellant"), appeals from the judgment of the Ashtabula County Court of Common Pleas sentencing appellant to an aggregate prison term of 61 to 66 years to life in prison upon his convictions of six counts of rape and a disseminating matter harmful to juveniles.

{¶2} We conclude that the trial court did not abuse its discretion when it granted the State's motion in limine and limited testimony and evidence pursuant to R.C. 2907.02(D), Ohio's rape-shield law. There was no evidence that any past sexual abuse

was fabricated, and thus, was appropriately excluded. Further, the victim's medical records, some of which predated the alleged abuse, were neither compiled by the victim ("C.R.B.") nor did they contain any statements by C.R.B. The proffered exhibits did not demonstrate that C.R.B. lacked the capacity, ability, or opportunity to observe, remember, or relate the events. Evid.R. 616(B). Unless explicitly permitted by another evidentiary rule, "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness . . . may not be proved by extrinsic evidence." Evid.R. 608(B). While the proffered documents do not fall within an enumerated exception to this general prohibition to the use of extrinsic evidence, the trial court, in exercising its discretion, allowed counsel to inquire during the cross-examination of C.R.B. and use the medical records for impeachment. The trial court properly excluded the subject exhibits pursuant to Evid.R. 608(B) and Evid.R. 403 as doing so would have been more prejudicial than probative.

{¶3} Upon review of the record, and in viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Therefore, sufficient evidence was presented to support appellant's convictions. Further, this is not an exceptional case in which the jury clearly lost its way and created such a manifest miscarriage of justice that appellant is entitled to a new trial. Appellant's convictions are consistent with the manifest weight of the evidence.

{¶4} As such, we affirm the judgments of the Ashtabula County Court of Common Pleas.

2

Case No. 2023-A-0073

**Substantive and Procedural Facts**

{¶5}    On May 25, 2022, the Ashtabula County Grand Jury returned a seven-count indictment charging appellant with four counts of rape, first degree felonies, in violation of R.C. 2907.02(A)(1)(b)&(B) (Counts 1, 2, 3, and 4); two counts of rape, first degree felonies, in violation of R.C. 2907.02(A)(2)&(B) (Counts 5 and 6); and disseminating matter harmful to juveniles, a fourth degree felony, in violation of R.C. 2907.31(A)(3)&(F) (Count 7).

{¶6}    On June 6, 2022, appellant pleaded not guilty to the charges contained in the indictment. A personal recognizance bond was set at $60,000 with GPS monitoring and appellant was ordered to have no contact with the victim, C.R.B., or her family.

{¶7}    On July 17, 2023, the State filed a motion in limine to exclude C.R.B.'s records from the Ashtabula County Medical Center ("ACMC"), Phoenix Rising Behavioral Healthcare and Recovery, Inc. ("Phoenix Rising"), as well as exclude C.R.B.'s records which may include other services unrelated to the charges in this case. Appellant opposed. On August 29, 2023, a hearing was held on the motions.

{¶8}    The trial court granted the State's motion on September 13, 2023. Specifically, the trial court concluded that "the records that predate the alleged offenses here, from * * * ACMC, Pheonix Rising * * * and the Children Servies agencies shall not be introduced or referenced by the Defendant without a separate determination as to their relevancy. This information may be referenced to impeach and corroborate times and dates or show inconsistencies in testimony. However, consistent with R.C. 2907.02(D), no references shall be made to the investigations and records of the alleged victim's past sexual abuse by other perpetrators." Dkt. 85, p. 2.

3

{¶9}   The case proceeded to a jury trial on October 14, 2023. The following facts were presented at trial:

{¶10}   At the time of trial, C.R.B. was a sixteen-year-old high school student. She was born on October 16, 2007. C.R.B. testified that appellant was a former boyfriend of her mother's, Amanda Charlton ("Charlton"). [1]

{¶11}   When C.R.B. was 11 years old, from October 16, 2018 to October 15, 2019, Charlton was dating appellant. C.R.B. testified that she would visit appellant at his home on North Myers Road in Geneva, Ohio. C.R.B. testified that she and her two siblings would stay with appellant while Charlton was working or when Charlton's fibromyalgia would flare up. C.R.B. stated that she would stay overnight a couple times a week. C.R.B. testified that her older sister and younger brother would often be taken back home and she would stay the night at appellant's home alone. When C.R.B.'s siblings stayed the night, they all slept in the living room.

{¶12}   C.R.B. testified that during one overnight stay in February, appellant started raping her. C.R.B. testified that she was sleeping on the couch when appellant woke her up. She testified that he performed oral sex on her. He then vaginally penetrated her with his penis and got on top of her.  C.R.B. testified that it hurt, and she was scared. C.R.B. testified that during this time she had bladder issues, experienced bed wetting, and had to wear a pull up. According to C.R.B., appellant engaged in sexual conduct with her "pretty much every day."

{¶13}   C.R.B. testified that the appellant would come into the bathroom and occasionally watch her shower. C.R.B. testified that after showering, appellant made her

---

1. Charlton was previously married to appellant's nephew for approximately six years.

4

watch pornography on his computer with him. C.R.B. described the video as a "woman sitting on the guy's face and the guy was licking her vagina." C.R.B. testified that she was wearing a t-shirt and a pull up. After watching the video, appellant had C.R.B. "go on the bed and sit on his face." While she was sitting on appellant, he was performing oral sex on C.R.B. According to C.R.B., appellant laid her down on the bed and inserted his penis in her vagina.

{¶14} C.R.B. testified that this type of activity continued until she was "13, almost 14 years old." When she was 12 years old, between October 16, 2019 and October 15, 2020, appellant would fondle her breasts, touch and perform oral sex on her, and penetrate her vagina with his penis. She described appellant's body including his penis and testified that appellant ejaculated during some of the encounters. C.R.B. testified that the rapes continued to hurt and happened at least two times when she was 12 years old.

{¶15} At 13 years old, appellant began having C.R.B. perform oral sex on him. C.R.B. testified that appellant told her she would have to lie if anyone found out about their relationship and asked C.R.B. to pen a letter asking him to perform oral sex on her. C.R.B. testified that appellant told her that he would use the letter against her if she ever told anyone.

{¶16} C.R.B. testified that appellant had her sit on his penis. She also testified that he would insert his penis when she was on her back with her legs in the air. She testified that it no longer hurt because she "had gotten used to the pain at that point." C.R.B. indicated that appellant would masturbate and ejaculate onto the carpet after raping her.

{¶17} C.R.B. testified that appellant would use lube or condoms and that the condoms were to prevent pregnancy. C.R.B. testified that appellant made her take

5

pregnancy tests when she was 13 years old and that the tests were negative. C.R.B. reiterated that the rapes occurred "pretty much every day" that she was staying at appellant's house. She testified that it happened more than two times when she was 13 years old.

{¶18} In June or July 2021, C.R.B. testified that appellant and Charlton's relationship began to sour and C.R.B. stopped going to appellant's home. C.R.B. then disclosed the abuse to her Charlton's new boyfriend, Mark Wright. C.R.B. told Charlton the same night.

{¶19} C.R.B. testified she was medically evaluated at Rainbow Babies and Children's Hospital in Cleveland and a rape kit was completed. C.R.B. also testified that a forensic interview was conducted as well.

{¶20} C.R.B. testified that she would text and call appellant regularly and did ask to be adopted by appellant on more than one occasion. C.R.B. also testified that she asked to change her last name to appellant's. She also testified that she was seeing a therapist regularly during this time, including before and after the rapes.

{¶21} Nurse Kate Burns ("Nurse Burns") was employed as a pediatric emergency room nurse and sexual assault nurse examiner ("SANE") at Rainbow Babies and Children's Hospital in Cleveland. Nurse Burns testified that she evaluated C.R.B. on August 28, 2021. Nurse Burns began her examination with collecting a history from C.R.B. During the history, it was reported that C.R.B had been raped by two men, one four years ago, and the other, a month prior to the examination.

{¶22} According to Nurse Burns, C.R.B. reported that the individual penetrated her vagina with his fingers and penis and that it was painful. C.R.B. reported that oral sex

6

was performed on her by that person and that he showed her some pornography. Nurse Burns testified that C.R.B. indicated that she had a history of irregular periods and a history of depression. C.R.B. also reported that appellant would tell her he would kill himself if she got pregnant, and that he would die before going to prison.

{¶23} Nurse Burns testified that she then did a head-to-toe examination of C.R.B. Nurse Burns found no abnormalities or injuries except for some papules insider her labia minora which were determined to be a normal anatomical variant. There was no visible injury to her hymen. At the time of the examination, Nurse Burns described C.R.B. as "pretty much on the road to being done with growing into puberty." According to Nurse Burns, once individuals go through puberty, it is less likely to have injury to the hymen from a sexual assault.

{¶24} After C.R.B. told Charlton about the sexual assaults, Charlton filed a police report on August 27 or 28, 2021. The case was assigned to Detective Ted Barger ("Detective Barger") of the Ashtabula County Sheriff's Department. Detective Barger testified that he is specifically assigned to Children's Services. Detective Barger communicated with Children's Services. A forensic interview was scheduled with Elisa Bartone ("Ms. Bartone"), a caseworker for Ashtabula County Children Services. Ms. Bartone is an intake case worker who investigates child abuse and neglect. Ms. Bartone holds a certification through Finding Words, which allows her to conduct forensic interviews.

{¶25} Ms. Bartone testified that forensic interviews are conducted at the Child Advocacy Center ("CAC") located in the Signature Health Building. Ms. Bartone testified that she conducted the forensic interview of C.R.B. During the interview, C.R.B. disclosed

7

sexual assault by appellant. Ms. Bartone also testified at the time of the interview, that she knew that C.R.B. had a history of receiving mental health services through Signature Health and at Community Counseling Center.

{¶26} Appellant testified on his own behalf. Appellant was 70 years old at the time of trial. He testified that after the tragic loss of his two sons, he was on medication for severe depression.

{¶27} Appellant testified that Charlton was previously married to his nephew. During the marriage, appellant testified that he would see the family and their three children, including C.R.B., approximately two to three times a week. Appellant testified he assisted Charlton with rent and some of the utility bills for the residence. He also testified he made household repairs and paid for Christmas twice. After his nephew and Charlton split, the trailer was in disrepair and Charlton moved in with Walter Garretson and his wife. C.R.B. testified that there was a time when she and her family stayed with the Garretson's for about six months in 2017.

{¶28} According to appellant, he and Charlton became romantically involved. Appellant testified that when he would babysit the kids at Charlton's residence and, that all three kids were together when he was visiting or babysitting 99 percent of the time. Appellant testified that there were only two occasions when C.R.B. stayed at his house alone and showered at the residence once. According to appellant, C.R.B.'s older sister stayed at his home six times by herself. C.R.B.'s brother, who was a toddler, stayed with appellant "maybe two or three times."

{¶29} Appellant testified that when the children spent the night, the girls would sleep in the bedroom, and he and the boy would sleep in the living room. Appellant also

8

testified that he spent the most time with C.R.B.'s older sister. Appellant testified that the children "looked at me as a father figure or a grandfather figure. And I wasn't going to adopt them, so I come up with the idea to discuss with the mother to change their name to Dubois and they were happy and fine with that." Dkt. 133, T.p. Trial Vol. III, p. 105. Appellant also testified that on at least one occasion, he was introduced at the children's school as the girl's stepfather. Appellant denied touching any of the children inappropriately and denied having any sexual contact or conduct with C.R.B. Appellant further denied that he made C.R.B. draft a letter or note of any kind. According to appellant, his relationship with Charlton ended on August 12, 2021.

{¶30} At the conclusion of the trial, the jury convicted appellant of Counts 1, 2, 3, and 4, rape, first degree felonies, in violation of R.C. 2907.02(A)(1)(b)(B); Counts 5 and 6, rape, first degree felonies, in violation of R.C. 2907.02(A)(2)(B); and Count 7, disseminating matter harmful to juveniles, a fourth degree felony, in violation of R.C. 2907.31(A)(3)(F). Regarding Count 7, the jury also found that the victim C.R.B. was less than 13 years old at the time of the offense. Bond was revoked and a presentence investigation was ordered.

{¶31} On November 1, 2023, appellant filed a motion for a new trial and a motion to supplement request for hearing. The request was based on the trial court's exclusion of the medical records from ACMC and Phoenix Rising as well as the trial court's rulings limited cross-examination of the victim regarding alleged prior abuse. The State opposed the motion. The motion for a new trial was denied on November 9, 2023.

{¶32} A sentencing hearing was held on November 28, 2023. The trial court determined that none of the offenses merged for purposes of sentencing and sentenced

9

appellant as follows: Counts 1-4, ten years to life on each count; Count 5, indefinite term of a minimum of ten and maximum of 15 years in prison, Count 6, 10 years; and, Count 7, a prison term of 12 months. Each term was ordered to be served consecutively for an aggregate prison term of 61 to 66 years to life in prison.

{¶33} The trial court advised appellant of his duties to register as a Tier III sex offender.

## The Appeal

{¶34} Appellant timely appeals and raises two assignments of error for review:

{¶35} [1.] "The trial court's Judgment Entry of September 12, 2023 committed prejudicial error by granting the State's Motion in Limine and overruling Defendant-Appellant's proffer of records from Phoenix Rising, Ashtabula County Medical Center, and the Children Services Agency."

{¶36} [2.] "The trial court committed prejudicial error by failing to grant Defendant-Appellant's Motions for Acquittal in that the verdict was contrary to the manifest weight of the evidence."

## Motion In Limine

{¶37} In his first assignment of error, appellant asserts that the trial court erred when it granted the State's motion in limine regarding the use of C.R.B.'s medical records from Phoenix Rising, ACMC, and Children Services Agency. Specifically, he argues that the trial court's ruling restricted his ability to cross-examine C.R.B. in violation of his Sixth Amendment rights. We disagree.

{¶38} We review the trial court's decision to grant or deny a motion in limine under an abuse of discretion standard. *State v. Coxwell*, 2012-Ohio-6215 ¶ 19 (11th Dist.), citing

10

*State v. Lemons*, 2010-Ohio-3807, ¶ 37 (11th Dist.). " ' [W]hen the trial court determines that certain evidence will be * * * excluded from trial, it is well established that the order or ruling of the court will not be reversed unless there has been a clear and prejudicial abuse of discretion.' " *State v. Fast*, 2021-Ohio-2548, ¶ 73 (11th Dist.)*, quoting O'Brien v. Angley*, 63 Ohio St.2d 159, 163 (1980). An abuse of discretion is the trial court's " 'failure to exercise sound, reasonable, and legal decision-making.' " *State v. Beechler*, 2010-Ohio-1900, ¶ 62 (2d. Dist.), quoting *Black's Law Dictionary* (8th Ed. 2004). Therefore, upon review of an issue which is confided to the discretion of the trial court, the mere fact that a reviewing court would have reached a different result, without more, is not enough, to find error. *Id.*

{¶39} Further, the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." Similarly, Article I, Section 10 of the Ohio Constitution provides that "the party accused shall be allowed * * * to meet the witnesses face to face." While, cross-examination of a witness is a matter of right, the "extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." *State v. Green*, 66 Ohio St.3d 141, 147 (1993), citing *Alford v. United States*, 282 U.S. 687, 691, 694 (1931).

{¶40} Importantly, "the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (Emphasis in original.) *State v. Lang*, 2011-Ohio-4215, ¶ 83, quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). "Trial courts have 'wide latitude * * * to impose reasonable limits on such cross-examination based on

11

Case No. 2023-A-0073

concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " *State v. Fast*, 2021-Ohio-2548, ¶ 77, quoting *State v. McKelton*, 2016-Ohio-5735, ¶ 170.

{¶41} "These principles are further reflected in Evid.R. 611(A), which provides that '[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.' " *Fast,* 2021-Ohio-2548, at ¶ 78 (11th Dist.).

{¶42} Evid.R. 611(B) also provides in relevant part: "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility." Evid.R. 611(B). However, there are limitations to the use of extrinsic evidence on cross-examination.

{¶43} Evid.R. 608(B) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

{¶44} Evid.R. 616(B), "[a] defect of capacity, ability, or opportunity to observe, remember, or relate may be shown to impeach the witness either by examination of the witness or by extrinsic evidence."

12

**{¶45}** Appellant proffered the following exhibits: Pediatric Emergency Department Sexual Assault Medical/Forensic Record from Rainbow Babies and Children's Hospitals (State's Exhibit 4), certified records consisting of 118 pages from Phoenix Rising (Defendant's Exhibit H), and records consisting of 129 pages from Signature Health/ACMC, (Defendant's Exhibit I). Appellant argues that the records were intended to be used for impeachment purposes or as prior inconsistent statements in accordance with Ohio Evid.R. 607, 613, and 801(D)(1).

**{¶46}** The trial court's ruling expressly permitted this use. As noted above, the trial court determined that "this information may be referenced to impeach and corroborate times and dates or show inconsistencies in testimony. However, consistent with R.C. 2907.02(D), no references shall be made to the investigations and records of the alleged victim's past sexual abuse by other perpetrators." Dkt. 85.

### Rape-Shield - R.C. 2907.02(D)

**{¶47}** R.C. 2907.02(D), also known as rape-shield law provides: "Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, sexually transmitted disease or infection, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."

**{¶48}** "R.C. 2907.02(D) will render inadmissible evidence of the rape victim's sexual activity with one other than the accused where the evidence: does not involve the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the

13

offender; is offered simply to impeach the credibility of the victim; and is not material to a fact at issue in the case." *State v. Ferguson*, 5 Ohio St.3d 160, 165 (1983). While "the rape-shield law does not apply to prior accusations of sexual assault that involve a fabrication of sexual activity," there was no evidence that C.R.B. fabricated prior accusations of sexual assault. *State v. Carpenter*, 2022-Ohio-898, ¶ 52, (7th Dist.).

{¶49} Despite this bar, during cross-examination of C.R.B., defense counsel sought to illicit testimony regarding the other individual, including presenting the indictment against the other individual to C.R.B.  After objection by the State, the trial court stated:

> I am not going to allow questioning regarding any sexual activity between questions to this victim and what happened with this, Walter Garretson. I'm not going to allow regarding sexual activity, specific allegations, what occurred. Now, I will allow limited questioning as to, as it related to the charge here that you have presented here, Mr. Bobulsky. I see he was charged with some crimes here. That's a public record and I'm allowing it for the purpose that was stated by the defense, to look into the date aspect. You mentioned the dates. The dates are in—so for that limited purpose, I will allow the questioning.

Dkt. 132, Trial T.p. Vol. II, p. 81-83.

{¶50} During cross-examination, C.R.B. testified she knew an individual named Walter Garretson since 2017. She indicated that there was a time where she and her family stayed with the Garretsons for about six months and that they left prior to 2018. C.R.B. testified that appellant began to rape her in February 2018, after she left the Garretsons' house.

{¶51} During cross-examination of Nurse Burns, defense counsel once again attempted to discuss the allegations regarding Mr. Garretson. The State again argued rape-shield protections precluded introduction of the allegations. The trial court allowed

14

limited testimony but reiterated that the nurse could not go into any specifics of the sexual activity alleged between Mr. Garretson and C.R.B. Dkt. 132, Trial T.p. Vol. II, p. 214.

**{¶52}** C.R.B. testified that there was no overlap between any alleged abuse as her exposure to appellant and the other individual did not coincide. State's Exhibit 4, which was proffered by appellant, does not contradict this testimony.

**{¶53}** The trial court, in accordance with rape-shield protections, properly prohibited any testimony regarding alleged past sexual abuse by other perpetrators. "[T]he purpose of the rape shield law [is] to protect the victim from harassment and to discourage the tendency in rape cases to try the victim rather than the defendant." *State v. Stuart*, 2020-Ohio-3239, ¶ 41 (11th Dist.), quoting *State v. Egli*, 2008-Ohio-2507, ¶ 51 (11th Dist.) and *State v. Archibald*, 2007-Ohio-4966, ¶ 52 (11th Dist.); *see also State v. Gardner*, 59 Ohio St.2d 14, 17 (1979). The trial court did not abuse its discretion by excluding such evidence.

### Medical Records

**{¶54}** Defense counsel also attempted to target C.R.B.'s credibility with her prior medical history and her ongoing mental health struggles. C.R.B. did not deny receiving medical services including mental health services prior to the period of abuse. Indeed, C.R.B. testified she was taking allergy and depression medicine in April 2021. She also indicated that she went to a psychiatrist in March 2023. She testified that she had seen a therapist at Signature Health. C.R.B. testified that she was diagnosed with post-traumatic stress disorder ("PTSD") following the sexual abuse.

**{¶55}** On cross-examination, defense counsel inquired if C.R.B. recalled going to Pheonix Rising for additional services. C.R.B. did not initially recall. Defense counsel

15

Case No. 2023-A-0073

sought to refresh her recollection with Defendant's Exhibit H, which are records from Phoenix Rising, predating the alleged abuse, and were compiled by the facility. The defense sought to impeach C.R.B. with notations in those records suggesting she received a diagnosis of PTSD prior to the abuse. The trial court allowed the questioning as to dates and times, medications, and whether she knew her diagnosis and permitted the questioning in a limited capacity. Dkt. 132, Trial Tp. Vol. II, p. 104-105. The trial court similarly ruled regarding the ACMC records. Dkt. 132, Trial Tp. Vol. II, p. 116-117.

{¶56} Despite defense counsel's argument, the trial court determined that the records did not establish that C.R.B. had "[a] defect of capacity, ability, or opportunity to observe, remember, or relate." Evid.R. 616(B). Specifically, the trial court stated:

> I don't see anything here that shows or says in those records that any of these diagnosis whatever they may be, affect her ability to perceive what happened then or affect her perceive and relay today, for her relay today what happened then. I'm not seeing that and, frankly, we'd need an expect to go any further to say that diagnosis that she has would affect somehow her ability to perceive or relay what occurred to her. And you know that would come through an expert or a treatises, medical treatises. So I think these questions will be just very limited in respect to these records, okay.

Dkt. 132, Trial Tp. Vol. II, p. 119.

{¶57} On cross-examination, C.R.B. testified that she went to Pheonix Rising, received some type of psychotherapy, but could not recall why she went there, or what recommended medications she may have been taking. C.R.B. was adamant that she was not diagnosed with PTSD until after the sexual abuse. C.R.B. testified she was taking depression medicine and allergy medicine and stated that she was supposed to take medicine for traumatizing nightmares. She testified that she's been having traumatizing nightmares for about five years. While C.R.B. testified that she is not very good with

16

remembering dates and could not recall specifics about her therapy sessions which predated the abuse, the records do not support a finding that she lacked the capacity, ability, or opportunity to observe, remember, or relate. Therefore, this evidence was properly limited and did not fall within the exception of Evid.R. 616.

{¶58} Moreover, this evidence does not fall within the purview of Evid. R. 613 or Evid.R. 801 (D).

{¶59} Evid.R. 613(A) provides: "[i]n examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel." The crux of this rule is that the evidence involves a prior inconsistent statement or prior inconsistent conduct.

{¶60} Similarly, Evid.R. 801(D)(1) provides that a prior statement by a witness is not hearsay if: "[t]he declarant testifies at trial or hearing and is subject to examination concerning the statement, and the statement is (a) inconsistent with declarant's testimony, and was given under oath subject to examination by the party against whom the statement is offered and subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (b) consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive, or (c) one of identification of a person soon after perceiving the person, if the circumstances demonstrate the reliability of the prior identification."

{¶61} Here, the records, which contained no statements attributed to C.R.B., are neither prior inconsistent statements nor statements which fall under Evid.R. 801(D)(1).

17

{¶62} Any specific instances of C.R.B.'s conduct for the purpose of attacking or supporting her character for truthfulness may not be proved by extrinsic evidence unless expressly permitted by the Rules of Evidence. Evid.R. 608(B). As discussed above, the proffered documents are extrinsic evidence which do fall within one of the enumerated exceptions. In accordance with Evid.R. 608(B), the trial court, in exercising its discretion, allowed counsel to inquire during the cross-examination of C.R.B. her character for truthfulness or untruthfulness.

{¶63} Therefore, the trial court did not abuse its discretion when it granted State's motion in limine and limited the cross-examination of C.R.B in accordance with rape-shield protections and in accordance with the Rules of Evidence.

{¶64} As such, appellant's first assignment of error is without merit.

### Crim.R. 29 - Sufficiency & Manifest Weight

{¶65} Appellant argues in his second assignment of error that the trial court erred when it denied his motion for acquittal pursuant to Crim.R. 29. Specifically, defense counsel made a Crim.R. 29 motion at the close of State's case. Defense counsel argued that only a single witness, C.R.B, testified to the elements of the offense and asserted that C.R.B. was unreliable because she has an issue with her memory. The trial court denied the motion finding sufficient evidence was presented. Appellant renewed his Crim.R. 29 motion at the close of defense's case, and the renewed motion was also denied.

{¶66} A motion for acquittal under Crim.R. 29 challenges the sufficiency of the State's evidence to sustain a conviction of the charged offense. The question of whether sufficient evidence supports a conviction "is a test of adequacy," which we review de

18

novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Corteggiano*, 2024-Ohio-1653, ¶ 6 (11th Dist.), quoting *State v. Dent*, 2020-Ohio-6670, ¶ 15; *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶67}** Appellant also argues in this assignment of error that his convictions are against the manifest weight of the evidence.

**{¶68}** "[W]eight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 2007-Ohio-2202, ¶ 25. "In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "'When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony.'" *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin* at 175.

19

{¶69} Appellant was convicted of each count of the indictment including four counts of rape, first degree felonies, in violation of R.C. 2907.02 (A)(1)(b), two counts of rape, first degree felonies, in violation of R.C. 2907.02(A)(2), and a single count of disseminating matter harmful to juveniles, a fourth degree felony, in violation of R.C. 2907.31(A)(3)&(F).

{¶70} R.C. 2907.02 (A)(1) provides in relevant part: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies: * * * (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the person." "'Sexual conduct'" includes "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex." R.C. 2907.01(A).

{¶71} R.C. 2907.02(A)(2) provides: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶72} R.C. 2907.31(A) provides in relevant part: "No person, with knowledge of its character or content, shall recklessly do any of the following: * * *(3) While in the physical proximity of the juvenile or law enforcement officer posing as a juvenile, allow any juvenile or law enforcement officer posing as a juvenile to review or peruse any material or view any live performance that is harmful to juveniles."

{¶73} C.R.B. indicated that the sexual conduct and contact with appellant occurred almost every time she stayed at his house which was two or three times a week. She specifically testified to at least four different rapes occurring before she turned 13. She also testified to at least two rapes occurring after she turned 13. These rapes included

20

appellant digitally penetrating her vagina, performing oral sex on her, and having her perform oral sex on him. C.R.B. testified that appellant had her watch pornography on his computer and then reenact what they watched with him in his bedroom.

{¶74} This Court has held, "[t]he victim's testimony, if believed, was sufficient to convict appellant of the charged crime. When prosecuting an offender for rape, the state is not required to provide physical evidence of penetration. Rather, all the state must do is establish, beyond a reasonable doubt, that sexual conduct occurred. This may be accomplished through either physical evidence and/or witness testimony." *State v. DeJesus,* 2024-Ohio-2956, ¶ 48 (11th Dist.), quoting *State v. Henderson,* 2002-Ohio-6715, ¶ 36 (11th Dist.); *see also State v. Ross*, 2018-Ohio-452, ¶ 40 (11th Dist.).

{¶75} As such, C.R.B.'s testimony alone clears the sufficiency hurdle.

{¶76} With respect to appellant's argument that his convictions are against the manifest weight, he essentially argues that C.R.B. was not credible. There were numerous attempts at trial to suggest that C.R.B. was confusing her interactions with appellant with another defendant who was also charged with raping C.R.B.

{¶77} It is well established that the jury is in the best position to weigh the evidence placed before it. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986); *see also State v. Huertas-Alicia*, 2024-Ohio-2214, (11th Dist.). C.R.B. testified before the jury and the jury observed her on the witness stand. Any possible inconsistency in C.R.B.'s recitation of the events including her difficulty in recalling mental health services she received well before the sexual abuse was before the jury for consideration. Appellant's

21

testimony was also before the jury. In convicting appellant of all seven counts in the indictment, the jury clearly determined that C.R.B. was credible. Moreover, Nurse Burns testified that when C.R.B. was examined at the hospital, a month had passed since her last encounter with appellant. Nurse Burns testified that she did not expect to see any abnormalities or physical signs during the evaluation since this case involved the delayed disclosure of sexual assault. She also testified that because C.R.B. was nearing the full onset of puberty, the likelihood of seeing any physical injuries also decreases. Credibility determinations rest solely with the finder of fact.

{¶78} Thus, in viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Therefore, sufficient evidence was presented to support appellant's convictions. The trial court did not err when it denied the defense's Crim.R. 29 motions.

{¶79} This is not an exceptional case in which the jury clearly lost its way and created such a manifest miscarriage of justice that appellant is entitled to a new trial. Appellant's convictions are consistent with the manifest weight of the evidence

{¶80} Appellant's second assignment of error is without merit.

## Conclusion

{¶81} For the reasons set forth above, we affirm the judgments of the Ashtabula County Court of Common Pleas.

MATT LYNCH, J.,

JOHN J. EKLUND, J.,

concur.

22